UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARRY CLARDY,

                Plaintiff,                    Civil Action No. 12-cv-11153

      v.                            District Judge Bernard A. Friedman
                                     Magistrate Judge Laurie J. Michelson

MICHAEL MULLENS,
PATRICK MERRY, and
KEVIN SMITH,

                Defendants.
_____/

**REPORT AND RECOMMENDATION TO GRANT DEFENDANTS MULLINS AND
SMITH'S MOTION FOR SUMMARY JUDGMENT [15] AND
TO GRANT DEFENDANT MERRY'S MOTION FOR SUMMARY JUDGMENT [23]**

      Plaintiff Barry Clardy, a Michigan Department of Corrections inmate, claims that corrections

officers retaliated against him because he was unable to satisfactorily answer their questions about

a smuggling operation. Clardy says that when he worked for Michigan State Industries ("MSI") at

the Thumb Correctional Facility ("TCF"), two corrections officers, Defendants Michael Mullins

(misspelled "Mullens" in the caption) and Patrick Merry, questioned him about a smuggling

operation involving an MSI driver. He allegedly told the officers that he had no information about

the operation, which, says Plaintiff, motivated the officers to retaliate. Plaintiff was segregated and

then transferred, and, as a result, lost his prison job at MSI. Plaintiff has also sued an administrative

assistant at TCF, Kevin Smith, because Smith allegedly failed to serve Merry with Plaintiff's state-

court petition regarding this retaliation. Before the Court for Report and Recommendation (*see* ECF

No. 12) are Defendants Mullins and Smith's Motion for Summary Judgment (ECF No. 15) and

Defendant Merry's Motion for Summary Judgment (ECF No. 23). The Court RECOMMENDS that

both motions be GRANTED.

## I. BACKGROUND

According to Plaintiff, on January 10, 2011, he was taken to the "inspector[']s office" at the Thumb Correctional Facility because Defendant Mullins, then an inspector at TCF, wanted to speak with Plaintiff.  (ECF No. 1, Compl. at 3 (Pg ID 7).)  When Plaintiff arrived at the office, he saw Defendant Merry, another TCF inspector.  (*Id.*)  Plaintiff says that the two began questioning him "by telling Plaintiff that he knew why he was there."  (*Id.*)  When Plaintiff responded that he did not know why he was there, the inspectors repeated their question.  (ECF No. 1, Br. in Supp. of Compl. at 1 (Pg ID 13).)  Plaintiff again responded that he did not know why he was there.  (*Id.*)  According to Plaintiff,

> Finally[,] some time later they told [me] that they wanted to know some information [about] one of the truck drivers from [Michigan State Industries]. [I] tried to tell them that [I] did not know anything about this person.  The two inspectors started . . . telling [me] that [I] was blowing smoke up their ass, and they wanted [me] to talk to them about this truck drive[r].  They told [me] that [I] better talk for [I] had a lot to loose if [I] didn't.

(*Id.*)  Plaintiff says he "[o]nce again . . . told them [that] he knew nothing."  (*Id.*)  Plaintiff alleges that the back and forth went on for two hours.  (*Id.*)  The officers then permitted Plaintiff to return to work at MSI.  (*Id.*)

Plaintiff asserts that, about an hour later, a "Sergeant Miller" came to Michigan State Industries and told Plaintiff that the inspectors had ordered segregation.  (Br. in Supp. of Compl. at 1.)  When Plaintiff asked Miller why he was being placed in segregation, Miller told Plaintiff that he did not know the reason.  (*Id.*)

The next day, January 11, 2011, Miller went to segregation to give Plaintiff a "Notice of

2

Intent."   (Br. in Supp. of Compl. at 1.)   In a section titled "Behavior or Incident(s) Requiring Placement in Segregation" the Notice states: "Prisoner Clardy . . . is assigned to work in a secured caged area in MSI, during a shakedown of MSI there was several contraband items found that puts both staff and other prisoners safety in jeopardy. [He was] [p]laced in segregation pending investigation."  (Br. in Supp. of Compl., Ex. I (Pg ID 26).)   The Notice of Intent also provides a "Hearing Date" of January 12, 2011.  (*Id.*)

The next day, January 13, 2011, Plaintiff was transferred to the Ryan Correctional Facility, another level II prison.  (*See* Br. in Supp. of Compl. at 2.)  Plaintiff asserts that the transfer was "by order of the inspectors."   (*Id.*)   Allegedly, while waiting to be placed on the transfer van, a corrections officer told Plaintiff that he did not know why Plaintiff was being transferred since nothing had been found at MSI.  (*Id.*)

Plaintiff asserts that, prior to his transfer, he had worked at MSI over 12 hours per day for over 11 years.  (*Id.*)  Plaintiff seeks damages based on the inspectors' acts of placing him in segregation without a hearing, transferring him to another facility, and causing him to lose his prison job at MSI.  (Compl. at 3.)

On a motion for summary judgment, Defendants must establish that there are no genuine issues of material fact in dispute; so the Court will therefore only briefly recount the officers' divergent version of the facts.  Mullins avers that during a January 10, 2011 search of the MSI facility at TCF, contraband items were found, including, yards of rubber strips and canvas straps, store goods, glue, broken metal pieces, a digital scale, plastic baggies, hospital clothing, stuffed animals and toys, and chewing tobacco containers.  (ECF No. 15, Mullins & Smith's Mot. Summ.

J., Ex. A, Mullins Aff. ¶ 5.)[1]   Mullins further states that Plaintiff cooperated in the officers' investigation by confirming that there was a smuggling operation and telling the officers that he had received tobacco from an employee at MSI.  (Mullins Aff. ¶ 6.)  According to Mullins, Plaintiff agreed to be an informant, but the deputy warden thought that "it would be too risky."  (Mullins Aff. ¶ 7.)  Mullins says that Plaintiff was therefore placed in segregation, and, "[b]efore the hearing, . . . transferred out of [TCF]."  (*Id.*)  Mullins explains, "It was important to get [Clardy] out of the institution because he knew of the investigation and was fully capable of compromising it."  (*Id.*)

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material only if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).  The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party does so, the party opposing

---

[1]Incidently, Plaintiff has now grieved Mullins for lying in his affidavit and provided explanations for the various items of contraband; for example, he says that the hospital clothing and stuffed animal toys were present because MSI laundered clothing for Henry Ford Hospital.  (*See* ECF No. 17 at Pg ID 157-62.)

the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### B. The First Amendment Right Plaintiff Asserts Was Not Clearly Established When Mullins and Merry Acted

Plaintiff does not assert the common First Amendment retaliation claim: that he grieved or sued an officer who then retaliated. He instead claims, "although prisoners may ordinarily be transferred to another facility for any reason or for no reason at all, [a prisoner] may not be transferred in retaliation for his exercise of his [F]irst [A]mendment right to answer questions put to him by government official[s] investigating allegations of misconduct by correctional officer[s]." (ECF No. 1, Br. in Supp. of Compl. at 6 (Pg ID 18); *see also* ECF No. 29, Pl.'s Resp. to Merry's Mot. Summ. J. at 3.) In response to Mullins and Smith's summary judgment motion, Plaintiff similarly asserts: "The two inspectors could not find out the information they thought [I and two other] inmates knew so they wanted to make sure to keep [us] quiet so they had [us] locked up[] and transferred." (ECF No. 16, Pl.'s Resp. to Mullins & Smith's Mot. Summ. J. at 2.) And in response to Merry's summary judgment motion, Plaintiff asserts that he was transferred "after the [inspectors] questioned Plaintiff and found that [he] could not help them in their which hunt." (ECF No. 29, Pl.'s Resp. to Merry's Mot. Summ. J. at 2.) Reading Plaintiff's statements collectively, he apparently alleges a First Amendment right to assert ignorance in response to a correction officer's questions about a misconduct within the prison.

5

Defendants, without citing supporting authority, respond that there is no such First Amendment right: "Plaintiff claims that the inspectors retaliated against him for having no information regarding a smuggling operation. . . .  Simply put, having no information is not conduct protected by the First Amendment.  Neither is telling the inspectors that you can't help them." (Mullins and Smith's Mot. Summ. J. at 7; *see also* Merry's Mot. Summ. J. at 4.)

Although Defendants should have more explicitly asserted that the right Plaintiff alleges was not "clearly established" at the time of the inspector's investigation, Defendants have clearly raised the defense of qualified immunity and put Plaintiff on notice that "the ultimate burden of proof falls on the plaintiff to show that the defendants violated a right so clearly established that any official in defendants' positions would have clearly understood that he was under an affirmative duty to refrain from such conduct."  (Mullins & Smith's Mot. Summ. J. at 14-15; *see also* Merry's Mot. Summ. J. at 5 ("Defendant Merry is entitled to immunity").)  The Court finds that Defendants Merry and Mullins are entitled to qualified immunity because the right Plaintiff alleges was not "clearly established" at the time they allegedly engaged in retaliatory conduct.

Qualified immunity shields government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Feathers v. Aey*, 319 F.3d 843, 847 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  This protection applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).

On summary judgment, a defendant "'enjoys qualified immunity . . . unless the facts alleged

and evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established.'" *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010) (quoting *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009)).  The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Id.*  Further, the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Nonetheless, there need not be "a case directly on point" and there can be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions g[i]ve reasonable warning that the conduct then at issue violated constitutional rights." *Hope v. Pelzer*, 536 U.S. 730, 701 (2002). "Moreover, the fact that various courts have 'not agreed on one verbal formulation of the controlling standard' does not by itself entitle an officer to qualified immunity." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (quoting *Saucier*, 533 U.S. at 203).

When deciding whether the law is clearly established, this Court "look[s] first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit Court of Appeals] and other courts within [this] circuit, and finally to decisions of other circuits." *Key v. Grayson*, 179 F.3d 996,

999-1000 (6th Cir. 1999).

Plaintiff cites Supreme Court cases discussing criminal statutes prohibiting deprivation of rights secured by the Constitution.  These cases do not "clearly establish" a First Amendment right to assert ignorance in response to a correction officer's questions about a misconduct within the prison.  *See U. S. v. Price*, 383 U.S. 787, 789 (1966) ("The indictments allege assaults by [sheriff deputies and police officers, among others] upon the rights of the asserted victims to due process of law under the Fourteenth Amendment. . . .  The sole question presented in these appeals is whether [18 U.S.C. §§ 241, 242] make criminal the conduct for which the individuals were indicted." ); *Williams v. United States*, 341 U.S. 97, 98 (1951) ("The question in this case is whether a special police officer who in his official capacity subjects a person suspected of crime to force and violence in order to obtain a confession may be prosecuted under s 20 of the Criminal Code, 18 U.S.C. (1946 ed.) s 52, now 18 U.S.C.A. s 242."); *Logan v. United States*, 144 U.S. 263, 282 (1892) *abrogated in part by Witherspoon v. State of Ill.*, 391 U.S. 510 (1968) ("The principal question in this case is whether the right of a citizen of the United States in the custody of a United States marshal under a lawful commitment to answer for an offense against the United States, to be protected against lawless violence, is a right secured to him by the constitution or laws of the United States, or whether it is a right which can be vindicated only under the laws of the several states.").

Among Sixth Circuit Court of Appeals authority, Plaintiff cites the following cases in support of the alleged First Amendment right: *Scott v. Churchill*, 377 F.3d 565 (6th Cir. 2004); *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999); *Newsom v. Norris*, 888 F.2d 371 (6th Cir. 1989); and *Cale v. Johnson*, 861 F.2d 943, 944 (6th Cir. 1988) *abrogated by Thaddeus-X*, 175 F.3d 378.  (ECF No. 1, Br. in Supp. of Compl. at 6-7; ECF No. 16, Pl.'s Resp. to Mullins and Smith's

8

Mot. Summ. J. at 2; ECF No. 29, Pl.'s Resp. to Merry's Mot. Summ. J. at 3.)  But none of these cases clearly establish the right Plaintiff asserts.  In *Scott*, the inmate alleged that a corrections officer issued a false misconduct ticket because the inmate filed a grievance against the officer.  377 F.3d  at 567-68.  In *Thaddeus-X*, prison officials were accused of retaliating against inmates for filing a lawsuit against the warden and other officials.  175 F.3d at 383-84.  In *Newsom*, inmates alleged that officers retaliated against them for complaints "they had filed with the Warden criticizing the performance of . . . the Chairman of the Disciplinary Board."  888 F.2d at 373.  At issue in *Cale* was alleged retaliation for  an inmate's complaint about the "poor quality of food in the diet line." 861 F.2d at 944, 950-51.  Unlike each of these cases, Plaintiff does not allege that he was retaliated against for filing any complaint or grievance, or for, in the language of the First Amendment, "petition[ing] the Government for a redress of grievances," U.S. Const. amend. I.  Instead, he asserts that he was retaliated against because he could not, in the officers' view, satisfactorily answer the officers' investigatory questions.

Plaintiff also cites a district court case from this Circuit, *Spruytte v. Hoffner*, 181 F. Supp. 2d 736, 738 (W.D. Mich. 2001), in support of the alleged First Amendment right to assert ignorance in response to a correction officer's questions about a misconduct within the prison.  (*See* Pl.'s Resp. to Mullins and Smith's Mot. for Summ. J. at 2.)  But in *Spruyette*, the prisoners claimed retaliation for writing a letter to a newspaper about prison conditions.  *Id.* at 738; *see also id.* at 742-43 ("[T]he Court concludes that Spruyette was engaged in protected conduct when he wrote the letter to the editor of The Daily Reporter in response to the Januszka letter.").  Writing a letter to a newspaper about prison conditions — which the *Spruyette* court found was a matter of "public concern," *id.* at 742 — appears to this Court to be dissimilar from claiming ignorance in response to a prison

official's investigatory questions.  Plaintiff's lack-of-knowledge statements provide no comment upon a matter of public concern.

What remains is out-of-circuit case law.  Before turning to that body of authority, the Court notes that decisions from other jurisdictions only "clearly establish" a right if the decisions "point unmistakably to the unconstitutionality of the conduct complained of":

> "Our review of the Supreme Court's decisions and of our own precedent leads us to conclude that, in the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law.  For the decisions of other courts to provide such 'clearly established law,' these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting."

*Virgili v. Gilbert*, 272 F.3d 391, 393 (6th Cir. 2001) (quoting *Ohio Civil Service Employees Assoc. v. Seiter*, 858 F.2d 1171, 1177-78 (6th Cir. 1988)); *see also Havard v. Wayne County*, 436 F. App'x 451, 455 (6th Cir. 2011) ("In determining whether a right is clearly established, we 'may rely on decisions of the Supreme Court, decisions of this court and courts within this circuit, and in limited instances, on decisions of other circuits.'"); *Eugene D. by & through Olivia D. v. Karman*, 889 F.2d 701, 708 (6th Cir. 1989) ("[O]ur court will not be easily swayed by the decisions of circuit and district courts other than our own when determining whether a constitutional right has been clearly established in this circuit.").

Among the out-of-circuit case law cited by Plaintiff, *Cornell v. Woods*, 69 F.3d 1383, 1386 (8th Cir. 1995) is most supportive of his claim that there is a First Amendment right to assert ignorance in response to a correction officer's questions about a misconduct within the prison.  In

10

*Cornell*, "two representatives from the penitentiary's internal affairs office interviewed Cornell[,] [an inmate residing in the Iowa State Penitentiary,] concerning a suspected violation of institutional rules." 69 F.3d at 1386. The internal affairs officers were investigating allegations that a corrections officer had "violated multiple rules prohibiting particular transactions between prison employees and inmates or members of inmates' families." *Id.* After Cornell was promised immunity from discipline if he cooperated in the investigation, he admitted "that he and [the officer under investigation] had contracted for the officer to construct a fence surrounding a house owned by Cornell's wife." *Id.* The corrections officer under investigation was subsequently forced to resign. *Id.* Another officer allegedly then prepared a retaliatory disciplinary report against Cornell for violating "the institutional rule prohibiting contracts between inmates and employees." *Id.* When Cornell sought to invoke his immunity, the corrections officers did not honor their promise. *Id.* Following a two-day bench trial, the district court found that "prison authorities impermissibly transferred Cornell based on the prisoner's exercise of his First Amendment rights in talking to and cooperating" in the investigation. *Id.* at 1387.

The Eight Circuit Court of Appeals affirmed. In determining whether Cornell had "a constitutional right to cooperate . . . in the internal prison investigation," the appellate court reasoned,

> We believe it to be self evident that ordinary citizens enjoy a constitutional privilege to freely participate in governmental investigations. . . .
>
> [T]he right to respond to a prison investigator's inquiries is not inconsistent with a person's status as a prisoner or with the legitimate penological objectives of the corrections system. To the contrary, we agree with the district court that truthfully answering questions concerning a misconduct investigation against a correctional officer is "undoubtedly quite consistent with legitimate penological

11

> objectives."  Consequently, we conclude under the facts of this case that Cornell's activity implicated his rights under the First Amendment.

*Cornell*, 69 F.3d at 1388.

Although *Cornell* certainly supports Plaintiff's asserted First Amendment right, the right recognized in *Cornell* is not on all fours with a First Amendment right to assert ignorance in response to a correction officer's questions about a misconduct within the prison.  In particular, the speech in *Cornell* was a prisoner's statements informing prison authorities about misconduct of a corrections officer.  In this case, however, Plaintiff alleges that he gave no information about the investigation and did not implicate any corrections officer in the investigated misconduct.  Restated, unlike the inmate in *Cornell*, Plaintiff did not "cooperate . . . in the internal prison investigation" or "participate in [a] governmental investigation"; he instead informed officers that he could not cooperate or participate in their investigation.

And even if this distinction is not material for First Amendment purposes, the Court notes that there is other out-of-circuit case law that strongly suggests — if not outright holds — that the right Plaintiff asserts does not fall under the First Amendment umbrella.  *Canosa v. State of Hawaii*, No. 05-00791, 2007 WL 128849, at *2, 6, 10 (Jan. 11, 2007) *report and recommendation adopted by* 2007 WL 473679 (D. Haw. Feb. 8, 2007) (holding, where inmate refused to answer correction officer's questions about who assaulted another inmate for fear of retaliation, "The act of refusing to provide information about fellow inmates is not 'protected conduct' under the First Amendment.  Defendants did not, therefore, chill, or attempt to chill, [Plaintiff's] First Amendment rights."); *Bradley v. Rupert*, No. 5:05CV74, 2007 WL 2815733, at *6 (E.D. Tex. Sept. 25, 2007) ("Bradley states that Miles [a Texas Department of Criminal Justice official] retaliated against him because

12

Bradley would not provide information regarding the theft of another inmate's radio. This allegation does not show that Miles retaliated against Bradley for the exercise of a constitutionally protected right; while Bradley may have had good reason for refusing to provide this information, his right to do so is not protected by the Constitution of the United States. Hence, Bradley has failed to set out a valid retaliation claim on this point."); *Dixon v. Gonzales*, No. 1:09-00172, 2009 WL 3416005, at *3 (Oct. 21, 2009) *report and recommendation adopted by* 2009 WL 5125612 (E.D. Cal. Dec. 21, 2009) ("Plaintiff contends that [Institutional Classification Committee] members . . . retaliated against Plaintiff for his refusal to disclose his enemy concerns amongst black gang members, or to disclose the reason for the assault on him at the . . . I.C.C. hearing. . . . Plaintiff indicates that he was unaware of any enemy or safety concerns, or conflicts with other gangs or persons, and informed the I.C.C. that he had no knowledge of any planned attack upon him. . . . The fact that Defendants recommended that Plaintiff be placed in [the security housing unit] for safety concerns because they did not believe him is not violative of the First Amendment. [To the extent that Plaintiff is attempting to state a claim for retaliation based upon a right to not speak (i.e., not to 'snitch'), that claim also fails.] There are no facts alleged indicating that Plaintiff was engaged in any protected conduct."); *Hardeman v. Quarterman*, No. 610-CV-16, 2010 WL 3782843, at *1-2 (E.D. Tex. Sept. 20, 2010) ("Although [Plaintiff] argues that his transfer to a more restrictive housing unit was done in retaliation for his refusal to provide information, he has failed to identify the specific constitutional right he invoked for which he suffered retaliation."); *Salazar v. Sullivan*, No. 1:09-CV-02264, 2011 WL 4623418, at *6 (E.D. Cal. Oct. 4, 2011) (citing *Dixon*, 2009 WL 3416005 with approval on similar facts); *but see Watson v. Norris*, No. 2:07-00102, 2007 WL 4287840, at *5 (E.D. Ark. Dec. 5, 2007) ("Plaintiff's choosing not to speak, regardless whether he did so to

protect a confederate or simply because he did not have knowledge of the information the Defendants sought, is an exercise of his First Amendment rights. The allegation is that Plaintiff declined to provide information, and the Defendants then placed him in a less-desirable housing situation. . . . The Court concludes that plaintiff's allegation that defendants violated his First Amendment rights by placing him in high-security housing in retaliation for failing to participate in an internal affairs investigation states a claim sufficient to survive summary judgment.").

Given the mixed authority, the Court is not convinced that the out-of-circuit case law "point[s] unmistakably to the unconstitutionality of the conduct [Plaintiff] complain[s] of and [is] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Virgili*, 272 F.3d at 393 (6th Cir. 2001) (internal quotation marks omitted).

In sum then, the Court finds that Plaintiff has not carried his burden of showing that a First Amendment right to assert ignorance in response to a correction officer's questions about a misconduct within the prison was "clearly established" when Defendants Mullins and Merry allegedly retaliated against Plaintiff for exercising this putative right. *Cf. Thaddeus-X*, 175 F.3d at 391 ("That inmates have a well-established constitutional right to access the courts, based in part on the First Amendment, is clear. Less clear are the contours of free speech rights in the prison setting."). Thus, Defendants Mullins and Merry are entitled to qualified immunity; summary judgment on Plaintiff's First Amendment claim is warranted.[2]

---

[2]The Court is aware that "[t]he defense of qualified immunity protects officials from individual liability for money damages but not from declaratory or injunctive relief." *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001). Further, sovereign immunity does not bar claims for prospective, injunctive relief against state actors in their official capacity. *See Ex parte Young*, 209 U.S. 123 (1908); *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008). But it does not

### C.   Plaintiff Was Not Deprived of a Liberty or Property Interest Entitled to Constitutionally Guaranteed Due Process

Plaintiff next asserts that Mullins and Merry deprived him of constitutionally guaranteed due process by placing him in segregation without a hearing.  (ECF No. 1, Br. in Supp. of Compl. at 8-9.)  According to Plaintiff, "there was no charges, just a [N]otice of [I]ntent, with a hearing date[] that never came.  Plaintiff was never charged with anything, just transferred for no reason."  (*Id.* at 8.)

Procedural Due Process claims are examined in two stages.  *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002) (citing, *inter alia*, *Bd. of Regents v. Roth*, 408 U.S. 564, 570-71 (1972); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).  "First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment.  Only after identifying such a right [does a court] continue to consider whether the deprivation of that interest contravened notions of due process."  *Id.*  Thus, "[w]ithout a protected liberty or property interest, there can be no federal procedural due process claim."  *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007).

Here, Plaintiff asserts that the failure to grant him a hearing caused him to be (1) unjustly placed in segregation for one to two days, (2) transferred to another (same-security-level) facility, and (3) lose his job at MSI.  A two-day stay in segregation and a transfer to another correctional

---

appear that Plaintiff seeks to enjoin Mullins or Merry from engaging in any ongoing or future conduct.  The relief Plaintiff seeks is back pay (including pay until he gets another similarly-paying job), $1.5 million in damages, filing fees and costs, and that Mullins and Merry be criminally charged and "placed in jail" under 18 U.S.C. §§ 241, 242.  (Compl. at 1 (ECF No. 1 at Pg ID 7).)

As for Plaintiff's claims for damages against Mullins and Merry in their official capacity, those claims are barred by sovereign immunity.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Johnson v. Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004).

facility at the same security level are not deprivations of liberty within the context of the Due Process Clause. *See McKinley v. Bowlen*, 8 F. App'x 488, 492 (6th Cir. 2001) ("[A prisoner] has no liberty interest in remaining free of disciplinary segregation because such segregation does not impose an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995))); *Bazzetta v. McGinnis*, 430 F.3d 795, 804 (6th Cir. 2005) ("[A] prison inmate does not have a liberty interest in transfer from one prison to another for whatever reason or for no reason at all, within the State or to another State, regardless of differing conditions in the prisons.  Even a transfer to a maximum security facility with more burdensome conditions is within the normal limits or range of custody which the conviction has authorized the State to impose." (internal citations and quotation marks omitted)); *Crosky v. Ohio Dept. of Rehab. & Correction*, 2:09-CV-400, 2012 WL 748408 (S.D. Ohio Mar. 8, 2012) ("It is not disputed that Mr. Crosky spent 87 days in some form of segregation — either in 'the hole' as he describes in his complaint, in administrative segregation as argued in his summary judgment response, or local control (isolation) as asserted by the defendants.  Regardless, that type of deprivation clearly is not something which courts have found to be unusual or atypical for an inmate to experience, and it is not an actionable loss of a constitutionally-protected liberty interest.").

As for losing his MSI job, Plaintiff has not created a genuine issue of material fact as to whether he had a property or liberty interest in continued employment at MSI.  As the Sixth Circuit recently explained,

> Dobbins' procedural due process claim . . . was properly dismissed for failure to allege a liberty or property interest. Dobbins has no constitutional right to prison employment because the loss of his position does not impose an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see*

16

> *Pickelhaupt v. Jackson*, 364 Fed. Appx. 221, 226 (6th Cir. 2010).
> Nor does Dobbins have such a right under Michigan law, which gives
> prison administrators complete discretion regarding prisoner work
> assignments.   *See* Mich. Dep't of Corr. Policy Directive (PD)
> 05.02.100 (effective Feb. 25, 2008); *Stewart v. Mintzes*, 815 F.2d 80,
> No. 86-1120, 1987 WL 35931, at *1 (6th Cir. 1987).   Because
> Dobbins did not have a cognizable liberty or property interest in his
> position at KCF, his termination did not violate due process.

*Dobbins v. Craycraft*, 423 F. App'x 550, 552 (6th Cir. 2011); *see also Carter v. Tucker*, 69 F. App'x

678, 680 (6th Cir. 2003) ("Carter's allegation that he has not been restored to his former job does

not amount to an allegation of the deprivation of a liberty interest.  A prisoner has no constitutional

right to prison employment or a particular prison job. . . ."); *Robinson v. Shewalter*, 238 F.3d 423

(table) (6th Cir. 2000) ("[T]o the extent that Robinson was removed from his prison job, this action

does not constitute an atypical and significant hardship because he has no right to prison

employment.").[3]

Accordingly, summary judgment is warranted on Plaintiff's Due Process Clause claim.

---

[3]In *Pickelhaupt v. Jackson*, 364 F. App'x 221 (6th Cir. 2010), the Sixth Circuit panel noted
that there was a circuit split as to whether *Sandin*'s "atypical and significant hardship" test applied
to deprivations of property (in addition to deprivations of liberty).  This legal uncertainty does not
alter this Court's conclusion.  In *Pickelhaupt*, the Court affirmed the dismissal of the inmate's due
process claim by holding that the right alleged was not "clearly established":

> [W]e need not decide today whether *Sandin* applies to protected
> property interests, because Pickelhaupt has failed to demonstrate that
> this purported right was clearly established.  Although, as the district
> court held, *if* a property interest existed, it was clearly established in
> 2005 that a predeprivation hearing was required, it was not clearly
> established in 2005 that Pickelhaupt had a constitutionally protected
> property interest in a prison job at a set wage based on state
> regulations.

*Id.* at 226.  Similarly, Plaintiff has not shown that, when Mullins and Merry acted, the law "clearly
established" that an inmate has a protected property interest in a long-held prison job.

17

### D.  Plaintiff's Claims Against Defendant Smith

Plaintiff does not explicitly state how Defendant Smith violated federal law or the Constitution.  Plaintiff explains that when he previously filed a petition in state court regarding the very misconduct alleged in this case, Smith, then an administrative assistant at TCF, sent "Merry's Petition back to [Clardy] stating that Patrick Merry no longer works for the Michigan Department of Correction[s]."  (Compl., ECF No. 1 at Pg ID 2.)  When Plaintiff asked for Merry's address or the address of Merry's attorney, Smith allegedly "refused to give Plaintiff any address, and went on to state that Mr. Merry would not be a party in [the] action."  (*Id.*)  The Court generously construes Plaintiff's allegations as attempting to plead an access to courts claim against Smith.

One problem with this legal theory, however, is that Plaintiff has not pled (let alone produced sufficient summary-judgment evidence showing) that Smith's conduct prejudiced a non-frivolous claim against Merry.  *See Brown v. Matauszak*, 415 F. App'x 608, 612 (6th Cir. 2011) ("Essentially, a claim for denial of access to the courts has unique pleading requirements: a plaintiff must plead a case within a case, alleging the law and facts sufficient to establish both the interference with his access to the courts, and the non-frivolous nature of the claim that was lost."); *Rodgers v. Hawley*, 14 F. App'x 403, 409 (6th Cir. 2001) ("[D]epriving prisoners of [an] opportunity [to access the courts] only 'in some theoretical sense' will not establish a violation of the right to access the courts." (quoting *Lewis v. Casey*, 518 U.S. 343, 351 (1996))).  And the Court fails to see how Plaintiff could do so given that the state court dismissed Plaintiff's petition because "being segregated, transferred[,] and losing one's prison-based job are not matters subject to judicial review" under the Michigan statutes Plaintiff relied upon.  (ECF No. 1 at Pg ID 38-40, State Court Opinion and Order Granting Respondent's Motion to Dismiss.)  Plaintiff has not shown how the

18

addition of Merry as a respondent to his petition would have altered the state court's analysis.

Plaintiff has also failed to show how success on his access-to-courts claim would provide a remedy that he could not obtain by way of a direct suit against Merry.  *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002) ("[W]hen [an] access claim . . . looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought.  There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.").  Restated, a civil action against Merry — such as this very suit — if successful, would apparently permit Plaintiff to recover all that Smith allegedly denied Plaintiff by failing to serve the state-court petition on Merry (or failing to give Plaintiff Merry's home address for service).  *See Broudy v. Mather*, 460 F.3d 106, 120 (D.C. Cir. 2006) ("If relief on the underlying claims is still available in a suit that may yet be brought, or a presently existing claim, the plaintiffs cannot meet [a necessary] element  of their [access-to-court] claims." (internal quotation marks and citations omitted)).

Accordingly, summary judgment is warranted on Plaintiff's claims against Smith.

### E.  Plaintiff's Claim that the Michigan Attorney General Cannot Represent Merry

Plaintiff asserts, without citing any authority, that the Michigan Attorney General cannot represent Merry in this case because Merry is no longer employed by the Michigan Department of Corrections.  (Pl.'s Resp. to Merry's Mot. Summ. J. at 1.)  Plaintiff has not established standing to challenge who Merry has selected to represent him in this action or the Michigan Attorney General's decision to represent a former MDOC employee (including whether, as a condition of Merry's former employment, Merry is entitled to the Attorney General's representation).  *See Washington*

19

*v. Randall-Owens*, No. 06-12588, 2007 WL 1153042, at *1 (E.D. Mich. Apr. 18, 2007) (holding

that, contrary to inmate's belief, certain MDOC policy directives did not "provide standing for an

opposing party to challenge the assignment of the Attorney General's office" and concluding that

the court had "no basis" to alter the representation of the defendants).

## III.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court RECOMMENDS that Mullins and Smith's Motion for

Summary Judgment (ECF No. 15) and Merry's Motion for Summary Judgment (ECF No. 23) be

GRANTED.  If this Report and Recommendation is adopted, no claims would remain in this case.

Any pending motions should therefore be denied as moot.

## IV.  FILING OBJECTIONS TO THIS REPORT

The parties to this action may object to and seek review of this Report and Recommendation

within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*,

474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and

Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal

quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case

Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies,

through the Clerk's Office. *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon

this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2).  Once an

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  August 29, 2012


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 29, 2012.


s/J. Johnson
Deputy Clerk